# TRANS WORLD AIRLINES, INC. *v.* THURSTON ET AL.

No. 83–997.   Argued October 9, 1984—Decided January 8, 1985*

---

*Together with No. 83–1325, *Air Line Pilots Association, International* v. *Thurston et al.*, also on certiorari to the same court.

POWELL, J., delivered the opinion for a unanimous Court.

*Henry J. Oechler, Jr.*, argued the cause for petitioner in No. 83–997. With him on the briefs were *Donald I. Strauber* and *Peter N. Hillman*. *Michael E. Abram* argued the cause and filed briefs for the Air Line Pilots Association, International, as petitioner in No. 83–1325 and respondent in No. 83–997.

*Deputy Solicitor General Wallace* argued the cause for respondent Equal Employment Opportunity Commission in both cases. With him on the briefs were *Solicitor General Lee, Harriet S. Shapiro, Johnny J. Butler,* and *Philip B. Sklover*. *Raymond C. Fay* argued the cause in both cases and filed a brief for respondents Thurston et al. With him on the briefs were *Alan M. Serwer* and *Susan D. Goland.*†

---

†Briefs of *amici curiae* urging reversal were filed for the Equal Employment Advisory Council by *Robert E. Williams, Douglas S. McDowell,* and *Thomas R. Bagby;* and for the Chamber of Commerce of the United States by *Stephen A. Bokat* and *Robin S. Conrad.*

*Robert M. Weinberg, Jeremiah A. Collins,* and *Laurence Gold* filed a brief for the American Federation of Labor and Congress of Industrial Organizations as *amicus curiae* urging affirmance.

*Edward L. Foote* and *Edward J. Wendrow* filed a brief for United Airlines, Inc., as *amicus curiae*.

JUSTICE POWELL delivered the opinion of the Court.

Trans World Airlines, Inc. (TWA), a commercial airline, permits captains disqualifed from serving in that capacity for reasons other than age to transfer automatically to the position of flight engineer. In this case, we must decide whether the Age Discrimination in Employment Act of 1967 (ADEA), 81 Stat. 602, as amended, 29 U. S. C. § 621 *et seq.*, requires the airline to afford this same "privilege of employment" to those captains disqualified by their age. We also must decide what constitutes a "willful" violation of the ADEA, entitling a plaintiff to "liquidated" or double damages.

I

A

TWA has approximately 3,000 employees who fill the three cockpit positions on most of its flights.[1] The "captain" is the pilot and controls the aircraft. He is responsible for all phases of its operation. The "first officer" is the copilot and assists the captain. The "flight engineer" usually monitors a side-facing instrument panel. He does not operate the flight controls unless the captain and the first officer become incapacitated.

In 1977, TWA and the Airline Pilots Association (ALPA) entered into a collective-bargaining agreement, under which every employee in a cockpit position was required to retire when he reached the age of 60. This provision for mandatory retirement was lawful under the ADEA, as part of a "bona fide seniority system." See *United Air Lines, Inc.* v. *McMann*, 434 U. S. 192 (1977). On April 6, 1978, however, the Act was amended to prohibit the mandatory retirement of a protected individual because of his age.[2] TWA officials

---

[1] On certain long-distance flights, a fourth crew member, the "international relief officer," is in the cockpit. On some types of aircraft, there are only two cockpit positions.

[2] Section 2(a) of the Age Discrimination in Employment Act Amendments of 1978, Pub. L. 95–256, 92 Stat. 189, 29 U. S. C. § 623(f)(2).

became concerned that the company's retirement policy, at least as it applied to flight engineers, violated the amended ADEA.[3]

On July 19, 1978, TWA announced that the amended ADEA prohibited the forced retirement of flight engineers at age 60. The company thus proposed a new policy, under which employees in all three cockpit positions, upon reaching age 60, would be allowed to continue working as flight engineers. TWA stated that it would not implement its new policy until it "had the benefit of [ALPA's] views."[4] ALPA's views were not long in coming. The Union contended that the collective-bargaining agreement prohibited the employment of a flight engineer after his 60th birthday and that the proposed change was not required by the recently amended ADEA.

Despite opposition from the Union, TWA adopted a modified version of its proposal.[5] Under this plan, any employee in "flight engineer status" at age 60 is entitled to continue

---

[3] A regulation promulgated by the Federal Aviation Administration prohibits anyone from serving after age 60 as a pilot on a commercial carrier. 14 CFR § 121.383(c)(1984). Captains and first officers are considered "pilots" subject to this regulation; flight engineers are not. Therefore, TWA officials were concerned primarily with the effect that the 1978 amendments had on the company's policy of mandatory retirement of flight engineers.

[4] The proposal was announced in a letter to ALPA from David Crombie, TWA's Senior Vice President for Administration.

[5] On the same date that TWA implemented its new policy, ALPA filed suit against the company. ALPA contended that TWA's action constituted a "unilateral change in working conditions," and hence was violative of the Railway Labor Act, 45 U. S. C. §§ 156–188. This action, *ALPA v. Trans World Airlines*, was consolidated with the present action in the United States District Court for the Southern District of New York. That court granted summary judgment in favor of TWA, and the Court of Appeals for the Second Circuit affirmed. It held that the new retirement policy did not constitute a "major" change in the existing terms and conditions of employment, and that the Union therefore was without a remedy in the federal courts. See 45 U. S. C. § 156.

working in that capacity. The new plan, unlike the initial proposal, does not give 60-year-old captains[6] the right automatically to begin training as flight engineers. Instead, a captain may remain with the airline only if he has been able to obtain "flight engineer status" through the bidding procedures outlined in the collective-bargaining agreement. These procedures require a captain, prior to his 60th birthday, to submit a "standing bid" for the position of flight engineer. When a vacancy occurs, it is assigned to the most senior captain with a standing bid. If no vacancy occurs prior to his 60th birthday, or if he lacks sufficient seniority to bid successfully for those vacancies that do occur, the captain is retired.[7]

Under the collective-bargaining agreement, a captain displaced for any reason besides age need not resort to the bidding procedures. For example, a captain unable to maintain the requisite first-class medical certificate, see 14 CFR § 67.13 (1984), may displace automatically, or "bump," a less senior flight engineer.[8] The medically disabled captain's ability to bump does not depend upon the availability of a vacancy.[9] Similarly, a captain whose position is eliminated due to reduced manpower needs can "bump" a less senior

---

[6] The term "captain" will hereinafter be used to refer to both the positions of captain and first officer.

[7] In 1980, TWA imposed an additional restriction on captains bidding for flight engineer positions. Successful bidders were required to "fulfill their bids in a timely manner." Under this amended practice, captains who bid successfully for positions as flight engineers were required to "activate" their bids immediately. As a result, many captains under age 60 were trained for and assumed flight engineer positions, with resulting lower pay and responsibility.

[8] The pilot must be able to obtain the second-class medical certificate that is required for the position of flight engineer. See 14 CFR § 67.15 (1984).

[9] If the disabled captain lacks sufficient seniority to displace, he is not discharged. Rather, he is entitled to go on unpaid medical leave for up to five years, during which time he retains and continues to accrue seniority.

flight engineer.[10]   Even if a captain is found to be incompetent to serve in that capacity, he is not discharged,[11] but is allowed to transfer to a position as flight engineer without resort to the bidding procedures.[12]

Respondents Harold Thurston, Christopher J. Clark, and Clifton A. Parkhill, former captains for TWA, were retired upon reaching the age of 60.   Each was denied an opportunity to "bump" a less senior flight engineer.   Thurston was forced to retire on May 26, 1978, before the company adopted its new policy.   Clark did not attempt to bid because TWA had advised him that bidding would not affect his chances of obtaining a transfer.   These two captains thus effectively were denied an opportunity to become flight engineers through the bidding procedures.   The third captain, Parkhill, did file a standing bid for the position of flight engineer. No vacancies occurred prior to Parkhill's 60th birthday, however, and he too was forced to retire.

## B

Thurston, Clark, and Parkhill filed this action against TWA and ALPA in the United States District Court for the Southern District of New York.   They argued that the company's transfer policy violated ADEA § 4(a)(1), 81 Stat. 603,

---

[10] Only those flight engineers in the current and last former domiciles of the displaced captain may be "bumped."   If a captain has insufficient seniority to displace a flight engineer at either of these domiciles, he is not discharged.   Instead, he is placed in furlough status for a period of up to 10 years, during which time he continues to accrue seniority for purposes of a recall.

[11] Although the collective-bargaining agreement does not address disciplinary downgrades, TWA's Vice President of Flight Operations, J. E. Frankum, stated that such downgrades had occurred "many times over many years."

[12] Captains disqualified for other reasons also are allowed to "bump" less senior flight engineers.   For example, the collective-bargaining agreement provides that a captain who fails to "requalify" in that position will not be discharged.

29 U. S. C. § 623(a)(1). The airline allowed captains displaced for reasons other than age to "bump" less senior flight engineers. Captains compelled to vacate their positions upon reaching age 60, they claimed, should be afforded this same "privilege of employment." The Equal Employment Opportunity Commission intervened on behalf of 10 other age-disqualified captains who had been discharged as a result of their inability to displace less senior flight engineers.[13]

The District Court entered a summary judgment in favor of defendants TWA and ALPA. *Air Line Pilots Assn.* v. *Trans World Air Lines*, 547 F. Supp. 1221 (1982). The court held that the plaintiffs had failed to establish a prima facie case of age discrimination under the test set forth in *McDonnell Douglas Corp.* v. *Green*, 411 U. S. 792 (1973). None could show that at the time of his transfer request a vacancy existed for the position of flight engineer. See *id.*, at 802. Furthermore, the court found that two affirmative defenses justified the company's transfer policy. 29 U. S. C. §§ 623(f)(1) and (f)(2). The United States Court of Appeals for the Second Circuit reversed the District Court's judgment. 713 F. 2d 940 (1983). It found the *McDonnell Douglas* formula inapposite because the plaintiffs had adduced *direct* proof of age discrimination. Captains

---

[13] Three of the EEOC claimants have settled with TWA. The remaining seven claimants are Lusk, Bobzin, Gowling, Widmayer, Humbles, Roquemore, and Lewis. Lusk and Bobzin were retired prior to August 10, 1978. Thus, like Harold Thurston, they had no way of knowing that the bidding procedures of the collective-bargaining agreement would represent a possible means of transferring to the position of flight engineer.

Gowling, Widmayer, Humbles, and Roquemore submitted standing bids for the position of flight engineer. Because no vacancies occurred prior to the time that they reached the age of 60, each was discharged.

Lewis submitted a bid and was awarded a position as flight engineer on October 31, 1979. On January 15, 1980, he was told that he would have to "fulfill his bid in a timely manner." See n. 7, *supra*. Because this would have required Lewis to assume his new position almost a year prior to his 60th birthday, he refused to appear for training. Therefore, his bid was canceled by TWA.

disqualified for reasons other than age were allowed to "bump" less senior flight engineers. Therefore, the company was required by ADEA § 4(a)(1), 29 U. S. C. § 623(a)(1), to afford 60-year-old captains this same "privilege of employment." The Court of Appeals also held that the affirmative defenses of the ADEA did not justify the company's discriminatory transfer policy.[14] 713 F. 2d, at 949–951. TWA was held liable for "liquidated" or double damages because its violation of the ADEA was found to be "willful." According to the court, an employer's conduct is "willful" if it "knows or shows reckless disregard for the matter of whether its conduct is prohibited by the ADEA." Id., at 956. Because "TWA was clearly aware of the 1978 ADEA amendments," the Court of Appeals found the respondents entitled to double damages. Id., at 956–957.

---

[14] The Court of Appeals also found that ALPA had violated ADEA § 4(c), 29 U. S. C. § 623(c), which prohibits unions from causing or attempting to cause an employer to engage in unlawful discrimination. The court found, however, that ALPA was not liable for damages. It held that the ADEA does not permit the recovery of monetary damages, including backpay, against a labor organization. It noted that the ADEA incorporates the remedial scheme of the Fair Labor Standards Act, which does not allow actions against unions to recover damages. 713 F. 2d, at 957.

In its petition for a writ of certiorari, TWA raised the issue of a union's liability for damages under the ADEA. Although we granted the petition in full, we now conclude that the Court is without jurisdiction to consider this question. TWA was not the proper party to present this question. The airline cannot assert the right of others to recover damages against the Union.

Both the individual respondents and the EEOC argue that the issue of union liability is properly before the Court. But the respondents failed to file a cross-petition raising this question. A prevailing party may advance any ground in support of a judgment in his favor. Dandridge v. Williams, 397 U. S. 471, 475, n. 6 (1970). An argument that would modify the judgment, however, cannot be presented unless a cross-petition has been filed. FEA v. Algonquin SNG, Inc., 426 U. S. 548, 560, n. 11 (1976). In this case, the judgment of the Court of Appeals would be modified by the arguments advanced by the EEOC and the individual plaintiffs, as they are contending that the Union should be liable to them for monetary damages.

TWA filed a petition for a writ of certiorari in which it challenged the Court of Appeals' holding that the transfer policy violated the ADEA and that TWA's violation was "willful." The Union filed a cross-petition raising only the liability issue. We granted certiorari in both cases, and consolidated them for argument. 466 U. S. 926 (1984). We now affirm as to the violation of the ADEA, and reverse as to the claim for double damages.

## II

### A

The ADEA "broadly prohibits arbitrary discrimination in the workplace based on age." *Lorillard* v. *Pons*, 434 U. S. 575, 577 (1978). Section 4(a)(1) of the Act proscribes differential treatment of older workers "with respect to . . . [a] privileg[e] of employment." 29 U. S. C. § 623(a). Under TWA's transfer policy, 60-year-old captains are denied a "privilege of employment" on the basis of age. Captains who become disqualified from serving in that position for reasons other than age automatically are able to displace less senior flight engineers. Captains disqualified because of age are not afforded this same "bumping" privilege. Instead, they are forced to resort to the bidding procedures set forth in the collective-bargaining agreement. If there is no vacancy prior to a bidding captain's 60th birthday, he must retire.[15]

The Act does not require TWA to grant transfer privileges to disqualified captains. Nevertheless, if TWA does grant

---

[15] The discriminatory transfer policy may violate the Act even though 83% of the 60-year-old captains were able to obtain positions as flight engineers through the bidding procedures. See *Phillips* v. *Martin Marietta Corp.*, 400 U. S. 542 (1971) *(per curiam)*.

It also should be noted that many of the captains who obtained positions as flight engineers were forced to assume that position prior to reaching age 60. See n. 7, *supra*. They were adversely affected by the discriminatory transfer policy despite the fact that they obtained positions as flight engineers.

some disqualified captains the "privilege" of "bumping" less senior flight engineers, it may not deny this opportunity to others because of their age. In *Hishon* v. *King & Spalding*, 467 U. S. 69 (1984), we held that "[a] benefit that is part and parcel of the employment relationship may not be doled out in a discriminatory fashion, even if the employer would be free . . . not to provide the benefit at all." *Id.*, at 75. This interpretation of Title VII of the Civil Rights Act of 1964, 42 U. S. C. § 2000(e) *et seq.*, applies with equal force in the context of age discrimination, for the substantive provisions of the ADEA "were derived *in haec verba* from Title VII." *Lorillard* v. *Pons, supra*, at 584.[16]

TWA contends that the respondents failed to make out a prima facie case of age discrimination under *McDonnell Douglas* v. *Green*, 411 U. S. 792 (1973), because at the time they were retired, no flight engineer vacancies existed. This argument fails, for the *McDonnell Douglas* test is inapplicable where the plaintiff presents direct evidence of discrimination. See *Teamsters* v. *United States*, 431 U. S. 324, 358, n. 44 (1977). The shifting burdens of proof set forth in *McDonnell Douglas* are designed to assure that the "plaintiff [has] his day in court despite the unavailability of direct evidence." *Loeb* v. *Textron, Inc.*, 600 F. 2d 1003, 1014 (CA1 1979). In this case there is direct evidence that the method of transfer available to a disqualified captain depends upon his age. Since it allows captains who become disqualified for any reason other than age to "bump" less senior flight engineers, TWA's transfer policy is discriminatory on its face. Cf. *Los Angeles Dept. of Water & Power* v. *Manhart*, 435 U. S. 702 (1978) (employer's policy requiring

---

[16] Several Courts of Appeals have recognized the similarity between the two statutes. In *Hodgson* v. *First Federal Savings & Loan Assn.*, 455 F. 2d 818, 820 (1972), for example, the United States Court of Appeals for the Fifth Circuit stated that with "a few minor exceptions the prohibitions of [the ADEA] are in terms identical to those of Title VII of the Civil Rights Act of 1964."

female employees to make larger contribution to pension fund than male employees is discriminatory on its face).

## B

Although we find that TWA's transfer policy discriminates against disqualified captains on the basis of age, our inquiry cannot end here. Petitioners contend that the age-based transfer policy is justified by two of the ADEA's five affirmative defenses. Petitioners first argue that the discharge of respondents was lawful because age is a "bona fide occupational qualification" (BFOQ) for the position of captain. 29 U. S. C. § 623(f)(1). Furthermore, TWA claims that its retirement policy is part of a "bona fide seniority system," and thus exempt from the Act's coverage. 29 U. S. C. § 623(f)(2).

Section 4(f)(1) of the ADEA provides that an employer may take "any action otherwise prohibited" where age is a "bona fide occupational qualification." 29 U. S. C. § 623(f)(1). In order to be permissible under § 4(f)(1), however, the age-based discrimination must relate to a "particular business." *Ibid.* Every court to consider the issue has assumed that the "particular business" to which the statute refers is the job from which the protected individual is excluded. In *Weeks* v. *Southern Bell Tel. & Tel. Co.*, 408 F. 2d 228 (CA5 1969), for example, the court considered the Title VII claim of a female employee who, because of her sex, had not been allowed to transfer to the position of switchman. In deciding that the BFOQ defense was not available to the defendant, the court considered only the job of switchman.

TWA's discriminatory transfer policy is not permissible under § 4(f)(1) because age is not a BFOQ for the "particular" position of flight engineer. It is necessary to recognize that the airline has two age-based policies: (i) captains are not allowed to serve in that capacity after reaching the age of 60; and (ii) age-disqualified captains are not given the transfer privileges afforded captains disqualified for other reasons.

The first policy, which precludes individuals from serving as captains, is not challenged by respondents.[17]  The second practice does not operate to exclude protected individuals from the position of captain; rather it prevents qualified 60-year-olds from working as flight engineers.  Thus, it is the "particular" job of flight engineer from which the respondents were excluded by the discriminatory transfer policy. Because age under 60 is not a BFOQ for the position of flight engineer,[18] the age-based discrimination at issue in this case cannot be justified by § 4(f)(1).

TWA nevertheless contends that its BFOQ argument is supported by the legislative history of the amendments to the ADEA.  In 1978, Congress amended ADEA § 4(f)(2), 29 U. S. C. § 623(f)(2), to prohibit the involuntary retirement of protected individuals on the basis of age.  Some Members of Congress were concerned that this amendment might be construed as limiting the employer's ability to terminate workers subject to a valid BFOQ.  The Senate proposed an amendment to § 4(f)(1) providing that an employer could establish a mandatory retirement age where age is a BFOQ. S. Rep. No. 95–493, pp. 11, 24 (1977).  In the Conference Committee, however, the proposed amendment was withdrawn because "the [Senate] conferees agreed that . . . [it] neither added to nor worked any change upon present law." H. R. Conf. Rep. No. 95–950, p. 7 (1978).  The House Committee Report also indicated that an individual could be compelled to retire from a position for which age was a BFOQ.  H. R. Rep. No. 95–527, pt. 1, p. 12 (1977).

---

[17] In this litigation, the respondents have not challenged TWA's claim that the FAA regulation establishes a BFOQ for the position of captain. The EEOC guidelines, however, do not list the FAA's age-60 rule as an example of a BFOQ because the EEOC wishes to avoid any appearance that it endorses the rule.  29 CFR § 1625 (1984).

[18] The petitioners do not contend that age is a BFOQ for the position of flight engineer.  Indeed, the airline has employed at least 148 flight engineers who are over 60 years old.

The legislative history of the 1978 Amendments does not support petitioners' position. The history shows only that the ADEA does not prohibit TWA from retiring all disqualified captains, including those who are incapacitated because of age. This does not mean, however, that TWA can make dependent upon the age of the individual the availability of a transfer to a position for which age is not a BFOQ. Nothing in the legislative history cited by petitioners indicates a congressional intention to allow an employer to discriminate against an older worker seeking to transfer to another position, on the ground that age was a BFOQ for his *former* job.

TWA also contends that its discriminatory transfer policy is lawful under the Act because it is part of a "bona fide seniority system." 29 U. S. C. § 623(f)(2). The Court of Appeals held that the airline's retirement policy is not mandated by the negotiated seniority plan. We need not address this finding; any seniority system that includes the challenged practice is not "bona fide" under the statute. The Act provides that a seniority system may not "require or permit" the involuntary retirement of a protected individual because of his age. *Ibid.* Although the FAA "age 60 rule" may have caused respondents' retirement, TWA's seniority plan certainly "permitted" it within the meaning of the ADEA. *Ibid.* Moreover, because captains disqualified for reasons other than age are allowed to "bump" less senior flight engineers, the mandatory retirement was age-based. Therefore, the "bona fide seniority system" defense is unavailable to the petitioners.

In summary, TWA's transfer policy discriminates against protected individuals on the basis of age, and thereby violates the Act. The two statutory defenses raised by petitioners do not support the argument that this discrimination is justified. The BFOQ defense is meritless because age is not a bona fide occupational qualification for the position of flight engineer, the job from which the respondents were excluded. Nor can TWA's policy be viewed as part of a bona

fide seniority system. A system that includes this discriminatory transfer policy permits the forced retirement of captains on the basis of age.

### III

### A

Section 7(b) of the ADEA, 81 Stat. 604, 29 U. S. C. § 626(b), provides that the rights created by the Act are to be "enforced in accordance with the powers, remedies, and procedures" of the Fair Labor Standards Act. See *Lorillard* v. *Pons*, 434 U. S., at 579. But the remedial provisions of the two statutes are not identical. Congress declined to incorporate into the ADEA several FLSA sections. Moreover, § 16(b) of the FLSA, which makes the award of liquidated damages mandatory, is significantly qualified in ADEA § 7(b) by a proviso that a prevailing plaintiff is entitled to double damages "only in cases of willful violations." 29 U. S. C. § 626(b). In this case, the Court of Appeals held that TWA's violation of the ADEA was "willful," and that the respondents therefore were entitled to double damages. 713 F. 2d, at 957. We granted certiorari to review this holding.

The legislative history of the ADEA indicates that Congress intended for liquidated damages to be punitive in nature. The original bill proposed by the administration incorporated § 16(a) of the FLSA, which imposes criminal liability for a willful violation. See 113 Cong. Rec. 2199 (1967). Senator Javits found "certain serious defects" in the administration bill. He stated that "difficult problems of proof . . . would arise under a criminal provision," and that the employer's invocation of the Fifth Amendment might impede investigation, conciliation, and enforcement. *Id.,* at 7076. Therefore, he proposed that "the [FLSA's] criminal penalty in cases of willful violation . . . [be] eliminated and a double damage liability substituted." *Ibid.* Senator Javits argued that his proposed amendment would "furnish an effective deterrent to willful violations [of the ADEA]," *ibid.,*

and it was incorporated into the ADEA with only minor modification, S. 788, 90th Cong., 1st Sess. (1967).

This Court has recognized that in enacting the ADEA, "Congress exhibited . . . a detailed knowledge of the FLSA provisions and their judicial interpretation . . . ." *Lorillard* v. *Pons, supra,* at 581. The manner in which FLSA § 16(a) has been interpreted therefore is relevant. In general, courts have found that an employer is subject to criminal penalties under the FLSA when he "wholly disregards the law . . . without making any reasonable effort to determine whether the plan he is following would constitute a violation of the law." *Nabob Oil Co.* v. *United States,* 190 F. 2d 478, 479 (CA10), cert. denied, 342 U. S. 876 (1951); see also *Darby* v. *United States,* 132 F. 2d 928 (CA5 1943).[19] This standard is substantially in accord with the interpretation of "willful" adopted by the Court of Appeals in interpreting the liquidated damages provision of the ADEA. The court below stated that a violation of the Act was "willful" if "the employer . . . knew or showed reckless disregard for the matter of whether its conduct was prohibited by the ADEA." 713 F. 2d, at 956. Given the legislative history of the liquidated damages provision, we think the "reckless disregard" standard is reasonable.

The definition of "willful" adopted by the above cited courts is consistent with the manner in which this Court has interpreted the term in other criminal and civil statutes. In *United States* v. *Murdock,* 290 U. S. 389 (1933), the defendant was prosecuted under the Revenue Acts of 1926 and 1928, which made it a misdemeanor for a person "willfully" to

---

[19] Courts below have held that an employer's action may be "willful," within the meaning of § 16(a) of the FLSA, even though he did not have an evil motive or bad purpose. See *Nabob Oil Co.* v. *United States.* We do not agree with TWA's argument that unless it intended to violate the Act, double damages are inappropriate under § 7(b) of the ADEA. Only one Court of Appeals has expressed approval of this position. See *Loeb* v. *Textron, Inc.,* 600 F. 2d 1003, 1020, n. 27 (CA1 1979).

fail to pay the required tax. The *Murdock* Court stated that conduct was "willful" within the meaning of this criminal statute if it was "marked by careless disregard [for] whether or not one has the right so to act." *Id.*, at 395. In *United States* v. *Illinois Central R. Co.*, 303 U. S. 239 (1938), the Court applied the *Murdock* definition of "willful" in a civil case. There, the defendant's failure to unload a cattle car was "willful," because it showed a disregard for the governing statute and an indifference to its requirements. 303 U. S., at 242–243.[20]

The respondents argue that an employer's conduct is willful if he is "cognizant of an appreciable possibility that the employees involved were covered by the [ADEA]." In support of their position, the respondents cite § 6 of the Portal-to-Portal Act of 1947 (PPA), 29 U. S. C. § 255(a), which is incorporated in both the ADEA and the FLSA. Section 6 of the PPA provides for a 2-year statute of limitations period unless the violation is willful, in which case the limitations period is extended to three years. 29 U. S. C. § 255(a). Several courts have held that a violation is willful within the meaning of § 6 if the employer knew that the ADEA was "in the picture." See, *e. g.*, *Coleman* v. *Jiffy June Farms, Inc.*, 458 F. 2d 1139, 1142 (CA5 1971), cert. denied, 409 U. S. 948 (1972); *EEOC* v. *Central Kansas Medical Center*, 705 F. 2d 1270, 1274 (CA10 1983). Respondents contend that the term "willful" should be interpreted in a similar manner in applying the liquidated damages provision of the ADEA.

We are unpersuaded by respondents' argument that a violation of the Act is "willful" if the employer simply knew of the potential applicability of the ADEA. Even if the "in

---

[20] The definition of "willful" set forth in *Murdock* and *Illinois Central* has been applied by courts interpreting numerous other criminal and civil statutes. See, *e. g.*, *Alabama Power Co.* v. *FERC*, 584 F. 2d 750 (CA5 1978); *F. X. Messina Construction Corp.* v. *Occupational Safety & Health Review Comm'n*, 505 F. 2d 701 (CA1 1974).

the picture" standard were appropriate for the statute of limitations, the same standard should not govern a provision dealing with liquidated damages.[21]   More importantly, the broad standard proposed by the respondents would result in an award of double damages in almost every case.   As employers are required to post ADEA notices, it would be virtually impossible for an employer to show that he was unaware of the Act and its potential applicability.   Both the legislative history and the structure of the statute show that Congress intended a two-tiered liability scheme.   We decline to interpret the liquidated damages provision of ADEA § 7(b) in a manner that frustrates this intent.[22]

### B

As noted above, the Court of Appeals stated that a violation is "willful" if "the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the ADEA."   713 F. 2d, at 956.   Although we

---

[21] The Courts of Appeals are divided over whether Congress intended the "willfulness" standard to be identical for determining liquidated damages and for purposes of the limitations period.   Compare *Spagnuolo* v. *Whirlpool Corp.*, 641 F. 2d 1109, 1113 (CA4) (standards are identical), cert. denied, 454 U. S. 860 (1981), with *Kelly* v. *American Standard, Inc.*, 640 F. 2d 974, 979 (CA9 1981) (standards are different).

[22] The "in the picture" standard proposed by the respondents would allow the recovery of liquidated damages even if the employer acted reasonably and in complete "good faith."   Congress hardly intended such a result.

The Court interpreted the FLSA, as originally enacted, as allowing the recovery of liquidated damages any time that there was a violation of the Act.   See *Overnight Motor Transportation Co.* v. *Missel*, 316 U. S. 572 (1942).   In response to its dissatisfaction with that harsh interpretation of the provision, Congress enacted the Portal-to-Portal Act of 1947.   See *Lorillard* v. *Pons*, 434 U. S. 575, 581–582, n. 8 (1978).   Section 11 of the PPA, 29 U. S. C. § 260, provides the employer with a defense to a mandatory award of liquidated damages when it can show good faith and reasonable grounds for believing it was not in violation of the FLSA.   Section 7(b) of the ADEA does not incorporate § 11 of the PPA, contra, *Hays* v. *Republic Steel Corp.*, 531 F. 2d 1307 (CA5 1976).   Nevertheless, we think that the same concerns are reflected in the proviso to § 7(b) of the ADEA.

hold that this is an acceptable way to articulate a definition of "willful," the court below misapplied this standard. TWA certainly did not "know" that its conduct violated the Act. Nor can it fairly be said that TWA adopted its transfer policy in "reckless disregard" of the Act's requirements. The record makes clear that TWA officials acted reasonably and in good faith in attempting to determine whether their plan would violate the ADEA. See *Nabob Oil Co.* v. *United States, supra.*

Shortly after the ADEA was amended, TWA officials met with their lawyers to determine whether the mandatory retirement policy violated the Act. Concluding that the company's existing plan was inconsistent with the ADEA, David Crombie, the airline's Senior Vice President for Administration, proposed a new policy. Despite opposition from the Union, the company adopted a modified version of this initial proposal. Under the plan adopted on August 10, 1978, any pilot in "flight engineer status" on his 60th birthday could continue to work for the airline. On the day the plan was adopted, the Union filed suit against the airline claiming that the new retirement policy constituted a "major" change in the collective-bargaining agreement, and thus was barred by § 6 of the Railway Labor Act, 45 U. S. C. § 156. Nevertheless, TWA adhered to its new policy.

As evidence of "willfulness," respondents point to comments made by J. E. Frankum, the Vice President of Flight Operations. After Crombie was hospitalized in August 1978, Frankum assumed responsibility for bringing TWA's retirement policy into conformance with the ADEA. Despite legal advice to the contrary, Frankum initially believed that the company was not required to allow any pilot over 60 to work. Frankum later abandoned this position in favor of the plan approved on August 10, 1978. Frankum apparently had been concerned only about whether flight engineers could work after reaching the age of 60. There is no indication that TWA was ever advised by counsel that its new transfer policy discriminated against captains on the basis of age.

There simply is no evidence that TWA acted in "reckless disregard" of the requirements of the ADEA. The airline had obligations under the collective-bargaining agreement with the Airline Pilots Association. In an attempt to bring its retirement policy into compliance with the ADEA, while at the same time observing the terms of the collective-bargaining agreement, TWA sought legal advice and consulted with the Union. Despite opposition from the Union, a plan was adopted that permitted cockpit employees to work as "flight engineers" after reaching age 60. Apparently TWA officials and the airline's attorneys failed to focus specifically on the effect of each aspect of the new retirement policy for cockpit personnel. It is reasonable to believe that the parties involved, in focusing on the larger overall problem, simply overlooked the challenged aspect of the new plan.[23] We conclude that TWA's violation of the Act was not willful within the meaning of § 7(b), and that respondents therefore are not entitled to liquidated damages.

## IV

The ADEA requires TWA to afford 60-year-old captains the same transfer privileges that it gives to captains disqualified for reasons other than age. Therefore, we affirm the Court of Appeals on this issue. We do not agree with its holding that TWA's violation of the Act was willful. We accordingly reverse its judgment that respondents are entitled to liquidated or double damages.

*It is so ordered.*

---

[23] In his dissent, Judge Van Graafeiland also focused on the larger problem, rather than on the discriminatory transfer policy. Judge Van Graafeiland stated: "TWA is the only trunk airline that voluntarily has permitted [persons] . . . over 60 to continue working as flight engineers. Instead of receiving commendation for what it has done, TWA is held liable as a matter of law for age discrimination," 713 F. 2d, at 957.